Pearson, J.
 

 The counsel on both sides supposed that
 
 Caffee
 
 v.
 
 Davis,
 
 1 Jones’ Eq. 1, had an important bearing upon our case. In that they are mistaken. Ours is a mere question of construction, i. e., what slaves did the testator intend to set free
 
 %
 
 So, we are not at liberty to enter the broad field of discussion, or go into an examination of the many cases cited in support of, and in opposition to,
 
 Caffee
 
 and
 
 Davis.
 
 It is proper, however, to say, we think the decision in that case can be sustained, both upon the
 
 reason of the thing,
 
 and by the analogy of the cases in regard to the increase of female
 
 *221
 
 slaves, whereby the principle is settled, that the increase does not, as in case of other chattels, belong to the owner of the mother at the birth, but passes with her to the remainderman, and by parity of reason, passes with her into a condition of freedom. When the title to herself is given to her, in other .words, when she is set free after the determination of a particular estate, the increase during that time, goes with her, because the taker of the first estate is excluded by the rule above stated in regard to slaves.
 

 We think proper also to say, in putting a construction upon the will now before us, we have a single eye to the intention of the testator, without reference to the notion that Courts should favor charities, and lean
 
 in frnorem Ubertatis;
 
 for, however humane we may suppose the feeling that prompts, it is not established that policy favors
 

 those acquired by his marriage, those received from his father’s estate, and those that he had bought. Ilis intention was to set free the first two classes, not as individuals but as stocks, answering to a general description, so as to include the whole, — young as well as old' — child as well as parent, all together, as classes, comprising the
 
 family
 
 negroes of his wife as well as of himself. Hence, in referenc to these two classes, he sets out no names ; but when he comes to the third class, and wishes to make an exception out of it, he names
 
 “
 
 old Joe and Ferryman Jim.” They are to be set free as exceptions out of a class, and are particularly named. In regard to' the others, they are to be set free as classes or stocks under a general description.
 

 This conclusion is supported by several other considera
 
 *222
 
 tions, which will suggest themselves to every one who peruses the will.
 

 Although there may be a difference of opinion in regard to the question, whether it is not a mistaken charity to turn a slave into a free negro, certain it is, the testator professes and supposed ho was doing a humane act. An intention to set tire whole
 
 class
 
 free is consistent with this idea; for then, grand-parents, parents and children, all go together. But, an intention to liberate only the old negroes, taken in connection with the words “ my executors are hereby
 
 strictly enjoined
 
 to take the requisite means for the transportation of said slaves to Liberia, under the
 
 di/rection mid patronage of
 
 the
 
 Colonization Society”
 
 is a mockery!! A decent regard for the memory of the testator, forbids any such supposition. The laws of our State allow old negroes who are emancipated for meritorious services to remain here. In the name of humanity, if the intention was to liberate only the old negroes, why did the testator require them to be separated from their children and grandchildren ; to be torn away from the place “ where they were raised,” and sent as exiles to Liberia ? Such could not have been the intention. The purpose was to direct all
 
 the.family negroes,
 
 in the largest sense of the words, tobe sent to Liberia ; and in so doing, he intended to aid, and take part in, the great and philanthropic purposes of the noble society to whose patronage he committed them.
 

 The strict injunctions given to his executors in regard to this bequest, besides tending to show that it was looked upon, and had more importance attached to it than the emancipation of a few old negroes would have called for, suggests this further consideration : "William J. McKay, a brother of the testator, is one of the executors, and under the will is entitled to a third part of all the slaves except those who are to be emancipated; so, he had a direct interest in the question; and as the fund was a very large one, it may be the testator deemed it proper to give this strict injunction, for fear that the interest of the executor might tempt him to disregard his duty; whereas
 
 *223
 
 such sj)ecial instructions would scarcely hare been given if the fund had been of small value.
 

 Again, the slaves who are to be emancipated are directed to be hired out for two years, so as to raise a fund to pay the expense of importation. The hire of the whole will produce a fund adequate for that purpose ; but the hire of the old negroes will scarcely support them during the two years.
 

 Again, when he made the will, the testator supposed his wife might out-live him, yet he gives her a life-estate in all the slaves, as well those who are to be set free, as those who are disposed of as property. If the old negroes only were to be sent to Liberia, why keep them here until the death of his wife ? The interposition of a life-estate is inconsistent with the supposition, that tire old negroes, personally, and as individuals, were the objects of the testator’s bounty, (many of ■whom would probably net live to enjoy it,) but agrees very well with the supposition that the intention was to include
 
 all
 
 of both stocks ; so as to mean “after my wife and myself are, both dead, I intend to liberate all our family negroes ; and as the descendants are to be free, my purpose will be effected, although some of the old ones may die before the period arrives.”
 

 The conclusions which Courts are enabled to form, in cases like the present, in regard to the intention of the testator, it must be confessed, are, to some extent, mere conjectures ; being inferences from other jjarts of the will, or from its general scope, pressed into service to show the meaning of an ambiguous expression. For this reason it is a relief to find that our conclusion is supported by a decision of this Court in a case where the words of the will were nearly the same as those we are now considering.
 
 Long
 
 v.
 
 Long,
 
 2 Murph. 19. The testator married in 1194, and acquired several slaves by his wife. She had issue, two daughters, and died. Tho testator died in 1809. His will contains this clause, “ I give and bequeath to my two daughters all my negroes, together Avith the future increase which came by my dear departed Eebeooa, their mother.” It was held, that the daughters Avere entitled to all
 
 *224
 
 the negroes which were horn of that stock, after the testator received them. The Court found the words
 
 future increase
 
 somewhat in the way; hut conclude, “ It appears to the Court that it was the intention of the testator by this clause, to give to his daughters the increase of the negroes which came by his wife. The expression used by the testator, will be under* stood in common parlance as comprehending the increase, lie speaks of the negoes
 
 generally
 
 as stock, without particu-larising them by name ; which circumstance is favorable to the idea, that as stock is to be diminished by death, so it must be kept up and supported by its natural increase.”
 

 It must be declared to be the opinion of the Court, that the clause directing emancipation, includes the descendants of the original stocks.
 

 Pek Curiam. . Decree accordingly,